UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KA-ZAR ALAN HANKS,

        Petitioner,               Case No. 1:08-cv-192

v.                                            Honorable Robert J. Jonker

CARMEN PALMER,

        Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, RULES GOVERNING § 2254 CASES; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, I recommend that the petition be dismissed for failure to raise a meritorious federal claim.

**Factual Allegations and Procedural History**

Petitioner is incarcerated in the Deerfield Correctional Facility. Petitioner was accused of sexually touching ten-year-old Alyssa Rouse while Petitioner was living with Alyssa and her mother in Coloma. Petitioner was tried in the Berrien County Circuit Court on August 11-12, 2005. The following is a summary of the evidence presented at trial as set forth by Petitioner in his application for leave to appeal in the Michigan Supreme Court, which is filed as an attachment to the petition:

> Complainant Alyssa Rouse, ten years old at the time of trial, testified that Mr. Hanks had lived with the complainant and her mother in Coloma, when the complainant was in school from kindergarten through fourth grade (T I 161; 168-169). Something happened with Mr. Hanks that the complainant did not like (T I 170). The complainant referred to the act as a "hand job," and did not recall when she first heard that term (T I 170). The complainant described that Mr. Hanks took off the bottom of his clothes, took the complainant's hand, placed it on his "private part" and then moved the complainant's hand up and down (T I 172). Mr. Hanks then ran into the bathroom, grabbed his private part, moved his hand up and down, and some white stuff came out and went onto toilet paper (T I 173-74).
>
> The complainant further testified that the act happened more than once (T I 174). Sometimes, Mr. Hanks touched the complainant's "private," which was her vagina (T I 176-177). Mr. Hank's private part was his "pee pee" (T I 176-177). Mr. Hanks would also touch the complainant over her clothing and would touch the complainant's "boobs" with his hands (T I, 178). The complainant testified that Mr. Hanks asked her to perform a "blow job" which was "sort of like a hand job except instead of using your hands, it's actually using your mouth" (T I, 179). Mr. Hanks would show the complainant a website on the Internet depicting how it was done (T I 179). The complainant refused because she was scared (T I 179). Mr. Hanks also showed the complainant pictures of "doggy style" and "teddy bear style" sex acts, and the two watched a video (T I 180-181).
>
> The complainant admitted that her mother had sex books in the residence, but denied looking at them (T I 185). She did not remember opening the bathroom door one time and seeing Mr. Hanks masturbating (T I 194). She did not peek or listen in on Mr. Hanks and her mother in their bedroom (T I 203). The complainant knew that her mother had a machine attached to a fake penis, which the complainant saw one time but did not turn on (T I 197-198).

The complainant testified that she disclosed to her mother three or four times and also told a school counselor (T I 180; 192). She also spoke with Robin Zollar, someone from Child Protective Services, and her grandmother (T I 187-188; 192). The complainant denied that they helped her remember things (T I 188). She did not remember telling Mr. Hanks and her mother that she had lied and that her dad and grandparents had put her up to it (T I 197-198).

Melissa Viganski, the complainant's mother, testified to becoming involved with Mr. Hanks following her separation in 2000 (T I 66-67). Viganski's ex-husband had introduced Mr. Hanks to her (T I 91-92). Mr. Hanks moved in with Viganski and would baby-sit the complainant after school while Viganski was at work (T I 68-69; 73). Mr. Hanks never bought separate gifts for the complainant or showed her favoritism (T I 129). The complainant did not like Mr. Hanks's discipline (T I 113).

At the Coloma residence, Mr. Hanks had adult books and movies, and Viganski also had some books as well as sex toys, which Viganski kept in her unlocked night stand (T I 177; 122). The books did not mention a "hand job" (T I 135).

Viganski testified to having a conversation with the complainant in the fall of 2003, during which the complainant disclosed that Mr. Hanks had touched her vaginal area and the complainant had seen Mr. Hanks naked touching himself (T I 84-85). Viganski confronted Mr. Hanks, who told Viganski that "it was made up" (T I 85-86). Mr. Hanks explained that "they were roughhousing and that's what it was, and nothing happened, and that she had walked in on him doing masturbation in the bathroom with the porno" (T I 76).

Viganski did not ask Mr. Hanks to move out at that point because it appeared the touching was accidental (T I 90). Viganski had gone through a contentious divorce, including custody issues (T I 89-91). Her ex-husband and his parents did not like Mr. Hanks (T I 113). Viganski further explained:

> [D]uring my divorce she [complainant] would come home and say that she was being asked if anyone had ever touched her, and that's what was brought up in the conversation when I first initially spoke with him [Mr. Hanks] was all the drilling that she was being asked during the divorce. And she [complainant] would come home and talk about it. So I didn't know what to believe at that time (T I 88).

Viganski further testified to having a conversation with the complainant in January 2004, and telling Mr. Hanks to move out of the residence (T I 79-80; 109; 125). Mr. Hanks later told Viganski that "nothing had happened" (T I 80). After Mr. Hanks moved out, Viganski had caught the complainant with one of her sex books (T I 123).

The complainant had been in counseling since summer 2004, and had spoken with two counselors (T I 118-119). The complainant never reported that her father and

- 3 -

grandparents had put her up to making a false claim ( T I 127). Viganski explained that she did not make a complaint until about August 2004 because "I went through a severe depression, and I was mentally unstable for a while after it happened" (T I 125).

Christopher Rouse, the complainant's father, testified to filing for divorce from Viganski in 2000 (T I 138). The divorce became final in July 2001 (T I 138-139). Viganski and Rouse had joint physical custody of the complainant (T I 139). Rouse was aware of the relationship between Mr. Hanks and Viganski, and did not particularly like Mr. Hanks (T I 139; 144). When Rouse picked up the children, Mr. Hanks would be at the Coloma residence (T I 141). The complainant did not like Mr. Hanks' discipline (T I 150-151).

Rouse had a conversation with the complainant in August 2004 at the Deer Forest, when the complainant asked to speak with Rouse alone (T I 142; 152-53). The complainant had described a "hand job" (T I 155). Rouse then spoke with Viganski and called protective services (T I 142-143). Rouse denied telling the complainant what to say (T I 152).

Social worker Barbara Welke, an expert in forensic interviewing and child sexual abuse cases, testified to doing more than 850 forensic interviews (T II 210-211; 213-214; 218). About fifty percent of the time, the interview team believed that a complainant had made a statement supporting allegations of child abuse, and the other fifty percent were either inconclusive or nothing supported the allegations (T II 218). Complainants in child sexual abuse cases typically delayed disclosure (T II 219-220).

When asked if there were cases where parents used their children to make allegations of sexual abuse, Welke responded: "I've experienced cases where I believe that an allegation was based on a parent or another adult coaching a child to say something - to say something that - in a vindictive type of way, yes" (T II 226). However, coached children typically were unable to provide specific details of sexual abuse (T II, 228-229).

Welke interviewed the complainant on August 13, 2004, following a referral from Child Protective Services (T II 214). The interview took place at the Family Independence Agency in Benton Harbor (T II 213). CPS Specialist Steve Zimmerle and Assistant Prosecutor Karen Hebets were also present (T II 215). Welke testified that she followed the forensic interviewing protocol to ensure that the interview was neutral and non-leading (T II 215).

The following exchange occurred about recording the interview and taking notes:

> Q. (by defense trial counsel) . . . . Are there interviews recorded?

>A. They are at this time. They were not at the time of - that I interviewed Alyssa [complainant].
>
> ***
>
>Q. . . . Do you - do you at the time, August 13, 2004, did you take any rough notes, or how do you know enough to prepare a report if you prepare a report.
>
>A. During the caregiver interview portion of the interview I take my own notes. During an interview with a child I typically don't take notes because I think it's distracting to the child and it's distracting to me. And we have an assigned note taker that's one of the observers in the observation room. I believe at - during the interview it was Steve Zimmerle, but one of the people that observes the interview is designated to be the note taker. I use those rough notes then to create my report.
>
>Q. And are those rough notes shared with the prosecutor's office?
>
>A. My final report is shared with the prosecutor's office.
>
>Q. But not your rough notes?
>
>A. Correct (T II 223-224).

Welke further explained:

>At the time of Alyssa's interview we were in the process of remodeling a facility of our own that we could do these interviews in. And a part of that remodeling, that design plan was to have electronic equipment to audio and video record interviews. Because we're using borrowed space at the Family Independence Agency, we weren't able to install that video and audio equipment. So now we videotape interviews. At that time we did not (T II 227).

Social worker Robin Zollar, another expert in forensic interviewing and child sexual abuse cases, likewise testified that sexually abused children typically delayed disclosure (T II 230; 236-237; 239). Zollar saw the complainant four times during 2004-2005 (T II 236-237). Zollar had the benefit of Welke's report before the sessions (T II 238). Zollar testified to using the forensic interview process (T II 237). The following exchange occurred concerning recording and note taking during interviews:

>Q. (by defense trial counsel) Do you - do you videotape your interviews?

- 5 -

>A. I do not. First of all, because I - in my private office I'm not set up to be able to do that, and it's not been necessary for me to do so over the years.
>
>Q. Do you prepare rough notes as you go through the interviews?
>
>A. I take notes during the interviews, yes, and then -
>
>Q. And then you dictate a report from those notes?
>
>A. That's correct (T II 243).

State Police detective sergeant Cathleen Heator testified to interviewing Mr. Hanks at the Orchards Mall and informing him of the allegations (T II 248; 250-251). Mr. Hanks admitted possessing pornographic videos, but denied the allegations (T II 251-252).

Mr. Hanks testified in his own defense that he moved in with the complainant's mother and her three children in December 2000 or January 2001 (T II 272). Mr. Hanks had been friends with the complainant's father, but things went sour after Mr. Hanks became friendly with the complainant's mother (T II 283). Mr. Hanks took care of the children and tried to instill discipline (T II 278). He got along "famously" with the complainant's brothers, but did not really like the complainant a whole lot, who Mr. Hanks characterized as "the pretty princess" (T II 279). He did not groom or show favoritism to the complainant (T II, 292).

Mr. Hanks had pornographic videos which he watched with the complainant's mother, but never around the children (T II 281). The complainant's mother also possessed sex toys, but Mr. Hanks did not play with them (T II 280-281).

Mr. Hanks first became aware of the allegations in October or November 2002, during a conversation with the complainant and her mother (T II 281). No criminal charges resulted (T II 282). Mr. Hanks had another conversation on January 4, 2004, when the complainant's mother threw him out (T II 284-285). In February 2004, the complainant's mother phoned Mr. Hanks to talk (T II 286). Mr. Hanks had six to ten phone conversations with the complainant's mother between January and August 2004 (T II 287). In August 2004, Mr. Hanks informed the complainant's mother that their relationship was over (T II 290).

Mr. Hanks denied ever asking the complainant to give him a "hand job" (T II 293; 295). He also denied touching the complainant's vagina or breasts (T II 293-294). He never watched pornographic videos with the complainant (T II, 294).

Mr. Hanks spoke with Detective Heator on August 30, 2004, and voluntarily turned himself in to the police on March 5, 2005 (T II 292; 296).

> When asked about possible motives for the complainant making false accusations, Mr. Hanks suggested his failure to return to the complainant's mother, the complainant's anger, as well as possible hostility from the complainant's grandparents and father (T II 298-300). Mr. Hanks admitted that the complainant's mother suddenly throwing him out on January 4, 2004 did not comport with a conspiracy theory (T II 302).

(Def. Application for Leave to Appeal in the Michigan Supreme Court, at 1-8, docket #1-2.)

The jury found Petitioner guilty of one count of second-degree criminal sexual conduct. On September 19, 2005, the trial court sentenced him to imprisonment of fifty months to fifteen years. Petitioner appealed his conviction, raising two claims of error. On June 19, 2007, the Michigan Court of Appeals issued an opinion affirming Petitioner's conviction. The Michigan Supreme Court denied his application for leave to appeal on January 8, 2008. In his application for habeas corpus relief, Petitioner raises the same two claims that were raised and rejected in the Michigan state courts:

I. THE TRIAL COURT VIOLATED [PETITIONER'S] DUE PROCESS RIGHTS BY EMPANELING A JURY WHOSE MEMBERS WERE REFERRED TO ONLY BY JUROR NUMBER.

II. THE PROSECUTOR VIOLATED APPELLANT'S DUE PROCESS RIGHTS BY FAILING TO PRESERVE AN ACCURATE RECORD OF PRE-TRIAL INTERVIEW OF THE TEN-YEAR-OLD COMPLAINANT IN THIS CASE INVOLVING ALLEGED SEXUAL ABUSE.

### Standard of Review

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied sub nom.*, *Texas v. Penry*, 547 U.S. 1200 (2006); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard

for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th Cir. 2008). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle

to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005)(quoting *Williams*, 529 U.S. at 409).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007); *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006)("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."), *cert. denied sub. nom. Keith v. Houck*, 127 S. Ct. 1881 (2007); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005)("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.")(citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d).  This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008).  This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable

application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d at 943.

The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003)(quoting *Williams*, 529 U.S. at 412); *see Fautenberry v. Mitchell*, 515 F.3d 614, 623 (6th Cir. 2008). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004)(describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry"). "'Federal Courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne*, 418 F.3d at 656 (quoting *Cone v. Bell*, 543 U.S. at 455). "The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'" *Dennis*, 354 F.3d at 517-18 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing

evidence 28 U.S.C. § 2254(e)(1); *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *cert. denied*, No. 07-9491, 2008 WL 503484 (U.S. Apr. 14, 2008); *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007); *Sinkfield v. Brigano*, 487 F.3d 1013, 1016 (6th Cir.), *cert. denied*, 128 S. Ct. 401 (2007). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Lundgren v. Mitchell*, 440 F.3d at 763.

## Discussion

### I. Anonymous Jury

Petitioner first claims that his due process rights were violated when the trial court referred to the jurors only by number. The Michigan Court of Appeals found that the issue was unpreserved for appeal because Petitioner did not object at trial to the trial court's referring to the jurors by numbers. The court of appeals went on to review the unpreserved issue for plain error, stating:

> To establish plain error requiring reversal, a defendant must demonstrate that "(1) error must have occurred, (2) the error was plain, i.e., clear or obvious, (3) and the plain error affected substantial rights." *Id.* at 763.
>
> This Court defined an "anonymous jury" as "one in which certain information is withheld from the parties, presumably for the safety of the jurors or to prevent harassment by the public." *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000). An "anonymous jury" implicates the following interests: "(1) the defendant's interest in being able to conduct a meaningful examination of the jury and (2) the defendant's interest in maintaining the presumption of innocence." *Id.* at 522-523. A challenge to an "anonymous jury" will only succeed where the record reflects that withholding information precluded meaningful voir dire or that the defendant's presumption of innocence was compromised. *Id.* at 523.
>
> In *Williams*, this Court discussed the appropriateness of an "anonymous jury" in great detail. In that case, the trial court referred to the jurors by numbers rather than by their names, and this Court concluded that there was nothing in the record that demonstrated any information was actually withheld from the parties. *Id.* While the jurors were "anonymous" in a literal sense, the record did "not support the conclusion that an 'anonymous jury,' in the strict sense of the term, was impaneled." *Id.* This Court underscored the key factor of an "anonymous jury," which is that

"'certain biographical information about potential jurors' is withheld" from the parties. *Id.* (citations omitted). Thus, this Court opted for a strict definition of "anonymous jury," where something more than just the jurors' names is withheld from the parties.

In reaching its conclusion, this Court noted that during voir dire the *Williams* defendant had access to juror biographical information contained in the juror questionnaire. *Id.* at 523-524. There was nothing in the record that indicated that the use of numbers instead of names was unusual or out of the ordinary. *Id.* at 524. Thus, the record demonstrated that the parties were able to conduct meaningful voir dire and that the defendant's presumption of innocence was not undermined. *Id.* Nonetheless, we strongly urge trial courts to advise the venire that any use of numbers in lieu of jurors' names is simply for logistical purposes and they should not in any way consider it a negative against the defendant.

In this case, the record reflects that the jurors were identified by numbers. However, the record also demonstrates that the juror questionnaires containing biographical information were provided to the parties, and that both parties conducted extensive voir dire. There is no indication that any of the jurors believed that there was any significance in the use of numbers instead of names. Further, defendant failed to demonstrate that the use of numbers prevented him from conducting meaningful voir dire or that his presumption of innocence was compromised. *Id.* at 523. We conclude that the jury in this case was anonymous only in a literal sense, so none of the dangers of an "anonymous jury" was implicated. *Id.* at 523. Thus, defendant has not established that plain error affected his substantial rights. *Carines, supra* at 763.

In reaching our conclusion, we find that defendant's reliance on two out-of-jurisdiction cases is misplaced. In *United States v Sanchez*, 74 F3d 562, 564 (CA 5, 1996), the United States Court of Appeals for the Fifth Circuit held that the trial court improperly withheld from the parties the jurors' names, the names of their spouses, the jurors' addresses and the jurors' employers.[1] But defendant fails to acknowledge a subsequent Fifth Circuit case that held that withholding jurors names and addresses did not rise to the level of an anonymous jury. See *United States v Branch*, 91 F3d 699, 723 (CA 5, 1996). We are bound by *Williams,* which found *Branch* persuasive. *Williams, supra* at 523.

Defendant also cites *State v Tucker*, 259 Wis 2d 484, 501-502; 657 NW2d 374 (2003), which held that withholding jurors' names only implicates a potential "anonymous jury." Although judicial decisions of foreign jurisdictions may be persuasive, they are not binding. *Hiner v Mojica*, 271 Mich App 604, 612; 722 NW2d 914 (2006). We are not persuaded that *Williams* was wrongly decided.

———

> [1] Similarly, other federal courts have held that withholding the names, spouses, addresses, and employers of jurors raises "anonymous jury" issues. *United States v Ochoa-Vasquez*, 428 F3d 1015, 1038 (CA 11, 2005); *United States v Shryock*, 342 F3d 948, 970 (CA 9, 2003); *United States v Mansoori*, 304 F3d 635, 649 (CA 7, 2002).

*People v. Hanks*, No. 266086, Slip Op. 1-2 (Mich. Ct. App. June 19, 2007).

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536-37 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 537. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence

it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Petitioner has made no such claim or showing of actual innocence in this case.

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369 (Mich. 1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Further, even though the court of appeals applied a limited review of the claimed error for plain error, Petitioner's failure to object is still considered a procedural default. *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Clifford v. Chandler*, 333 F.3d 724, 728-29 (6th Cir. 2003), *overruled in part on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989); *accord Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994). Accordingly, review by this court is barred unless Petitioner can show cause and prejudice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485.

Petitioner has not attempted to show cause for his failure to raise an objection before the trial court. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Regardless, Petitioner cannot show prejudice for his default. Prejudice requires the Petitioner to show that the alleged error "worked to his *actual* and substantial disadvantage." *Perkins v.*

*LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  The Michigan Court of Appeals thoroughly reviewed Petitioner's claim and concluded that no constitutional error had occurred.  Petitioner does not dispute that the juror questionnaires containing biographical information, including names, were provided to defense counsel.  Nor does Petitioner contend that the trial court's use of numbers in addressing the jurors prevented him from conducting meaningful voir dire.  Thus, Petitioner cannot show that he was substantially disadvantaged by the trial court's use of numbers, rather than juror names.  Moreover, there is no clearly established ruling from the United States Supreme Court governing use of an anonymous jury.  This Court only can grant habeas relief for violations of clearly established Supreme Court precedent.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412-13.  Accordingly, Petitioner's claim is without merit.

## II.     Failure to Record Interviews

In his second ground for habeas corpus relief, Petitioner claims that the prosecution violated his right to due process by failing to preserve an accurate record of the victim's pretrial interviews. Petitioner argues that the failure to preserve an accurate record of the interview questions and answers was critical to his theory that the complainant's father or grandparents had coached or pressured her to incriminate him.  The Michigan Court of Appeals again found that Petitioner failed to preserve the allege error by failing to raise an objection in the trial court.  The Michigan Court of Appeals reviewed for plain error and found none.  *People v. Hanks*, No. 266086 Slip Op. 2 (Mich. Ct. App. June 19, 2007).

For the same reasons set forth above, Petitioner procedurally defaulted his second ground for relief by failing to raise a contemporaneous objection in the trial court.  As a result, this Court is barred from reviewing his claim unless Petitioner can show cause and prejudice.  *Coleman*,

501 U.S. at 750; *Murray*, 477 U.S. at 485. Petitioner has not attempted to show cause for his failure to raise an objection before the trial court. Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy*, 757 F.2d at 100.

Even if Petitioner could show cause for his default, he cannot establish prejudice. In *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *California v. Trombetta*, 467 U.S. 479 (1984), the Supreme Court made clear that the government is not required to preserve all evidence which could plausibly be exculpatory during a defendant's trial or sentencing. *See Youngblood*, 488 U.S. at 58 (noting that the due process clause does not impose "an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution"). Rather, the government violates a defendant's due process rights only where the government acts in bad faith in destroying "potentially useful" evidence. *Youngblood*, 488 U.S. at 58 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitutes a denial of due process of law.").

Petitioner does not allege that the government destroyed, or even failed to preserve, evidence. His habeas petition is based on a presumed due-process duty of interviewers to record their interviews. The Supreme Court has never held, however, that the Due Process Clause requires the recording of interviews with potential child victims of sexual assault, or any other witness. To the contrary, the lower courts uniformly hold that the Constitution does not require government agents to record witness interviews. *See, e.g., United States v. Rodriguez*, 496 F.3d 221, 224 (2d Cir. 2007); *United States v. Houlihan*, 92 F.3d 1271, 1288-89 (1st Cir. 1996); *United States v. Marashi*, 913 F.2d 724, 734 (9th Cir. 1990). Although the government may not destroy recorded interviews in bad faith, it is under no constitutional duty to record them in the first instance. Petitioner,

therefore, is not entitled to habeas corpus relief, as no clearly established Supreme Court holding supports his claim.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be summarily dismissed pursuant to Rule 4 because Petitioner failed to raise a meritorious federal claim. I further recommend that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).


Dated:   April 18, 2008            /s/  Joseph G. Scoville
                                   United States Magistrate Judge


### NOTICE TO PARTIES
Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).